**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AARON TOBEY,

    *Plaintiff-Appellee,*

    v.

TERRI JONES, individually and in her official capacity as a Supervisory Transportation Security Officer with the Transportation Security Administration of the Department of Homeland Security; REBECCA SMITH, individually and in her official capacity as a Transportation Security Officer with the Transportation Security Administration of the Department of Homeland Security,

    *Defendants-Appellants,*

    and

QUENTIN TRICE, individually and in his official capacity as Chief of Police of the Richmond International Airport Police; CALVIN VANN, individually and in his capacity as an officer of the Richmond International Airport Police; ANTHONY MASON,

No. 11-2230

individually and in his official capacity as an officer of the Richmond International Airport Police; JEFFREY KANDLER, individually and in his official capacity as an officer of the Richmond International Airport Police; JANET NAPOLITANO, in her official capacity as Secretary of Homeland Security; JOHN S. PISTOLE, in his official capacity as Administrator, Transportation Security Administration; CAPITAL REGION AIRPORT COMMISSION; VICTOR WILLIAMS, in his official capacity as Director of Public Safety and Operations, Richmond International Airport Police; JANE DOE, individually and in her official capacity as a TSA Checkpoint Manager with the Transportation Security Administration of the Department of Homeland Security,

*Defendants.*

AARON TOBEY,

    *Plaintiff-Appellee,*

    v.

JANE DOE, individually and in her official capacity as a TSA Checkpoint Manager with the Transportation Security Administration of the Department of Homeland Security,

    *Defendants-Appellants,*

    and

QUENTIN TRICE, individually and in his official capacity as Chief of Police of the Richmond International Airport Police; CALVIN VANN, individually and in his capacity as an officer of the Richmond International Airport Police; ANTHONY MASON, individually and in his official capacity as an officer of the Richmond International Airport Police; JEFFREY KANDLER, individually and in his official capacity as an officer of the Richmond International Airport Police; REBECCA SMITH,

    No. 11-2276

individually and in her official capacity as a Transportation Security Officer with the Transportation Security Administration of the Department of Homeland Security; JANET NAPOLITANO in her official capacity as Secretary of Homeland Security; JOHN S. PISTOLE, in his official capacity as Administrator, Transportation Security Administration; CAPITAL REGION AIRPORT COMMISSION; VICTOR WILLIAMS, in his official capacity as Director of Public Safety and Operations, Richmond International Airport Police; TERRI JONES, individually and in her official capacity as a Supervisory Transportation Security Officer with the Transportation Security Administration of the Department of Homeland Security,

*Defendants.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Henry E. Hudson, District Judge.
(3:11-cv-00154-HEH)

Argued: October 24, 2012

Decided: January 25, 2013

Before WILKINSON, GREGORY, and DUNCAN,
Circuit Judges.

Affirmed by published opinion. Judge Gregory wrote the majority opinion, in which Judge Duncan joined. Judge Wilkinson wrote a dissenting opinion.

---

**COUNSEL**

**ARGUED:** August E. Flentje, UNITED STATES DEPART-MENT OF JUSTICE, Washington, D.C., for Appellants. Anand Agneshwar, ARNOLD & PORTER, LLP, New York, New York, for Appellee. **ON BRIEF:** Tony West, Assistant Attorney General, Douglas N. Letter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellants. James J. Knicely, Robert Luther III, KNICELY & ASSOCIATES, P.C., Williamsburg, Virginia; Alan C. Veronick, ARNOLD & PORTER, LLP, New York, New York; John W. Whitehead, Douglas R. McKusick, THE RUTHER-FORD INSTITUTE, Charlottesville, Virginia, for Appellee.

---

**OPINION**

GREGORY, Circuit Judge:

Aaron Tobey alleges he was retaliated against for exercising his First Amendment rights when at Richmond International Airport (RIC), Transportation Security Administration (TSA) agents and RIC police seized and arrested him for displaying the text of the Fourth Amendment to the United States Constitution on his chest. Seeking to vindicate his rights, Mr. Tobey brought an action in the United States District Court for the Eastern District of Virginia against the RIC police and TSA agents, alleging violations of his First, Fourth, and Fourteenth Amendment Equal Protection Clause rights. The TSA agents moved to dismiss the claims, asserting qualified immunity. The district judge sustained the motion as to the Fourth

and Fourteenth Amendment claims, but denied the motion for
the First Amendment claim. The TSA agents appeal the denial
to this Court and are the only parties to this appeal. Because
we find the facts as alleged by Mr. Tobey plausibly set forth
a claim that the TSA agents violated his clearly established
First Amendment rights, we affirm the district court's deci-
sion.

## I.

From the outset we must underscore that this case is before
us on appeal from denial of a Fed. R. Civ. P. 12(b)(6) motion
to dismiss. Therefore, the facts set forth are from the vantage
point of Mr. Tobey, with all reasonable inferences drawn in
his favor. *See Jenkins v. McKeithen*, 395 U.S. 411, 421-22
(1969); *Republican Party of North Carolina v. Martin*, 980
F.2d 943, 952 (4th Cir. 1992).

## A.

Following the September 11, 2001 terrorist attacks, Con-
gress created the Transportation Security Administration.
TSA is tasked with maintaining the security of commercial air
travel. TSA agents screen and search airline passengers at air-
ports, randomly selecting certain passengers for enhanced sec-
ondary screening. Under the then-current enhanced secondary
screening policies, passengers had a choice of submitting to
either an Advanced Imaging Technology (AIT) scan or a full-
body pat down. The purpose of TSA's procedures was limited
to finding "explosives, incendiaries, weapons or other items
and screening to ensure that an individual's identity is appro-
priately verified and checked against government watch lists."
TSA Management Directive No. 100.4 (Sept. 1, 2009).

On December 30, 2010, Aaron Tobey was scheduled to fly
from Richmond to Wisconsin to attend his grandfather's
funeral. Mr. Tobey waited until there was a short line at the
TSA screening checkpoint and then commenced the screening

process by presenting his boarding pass and identification to the pre-screening agent. Mr. Tobey proceeded to the conveyor belt area and placed his belt, shoes, sweatshirt, and other carry-on items on the conveyor. Mr. Tobey was then diverted by Appellant-Agent Smith from the standard metal detector used as the primary screening apparatus to the AIT scanning unit for enhanced screening.

In anticipation that he might be subjected to enhanced screening, Mr. Tobey had written the text of the Fourth Amendment on his chest as he believed AIT scanning was unconstitutional. Before proceeding through the AIT unit, Mr. Tobey calmly placed his sweatpants and t-shirt on the conveyor belt, leaving him in running shorts and socks, revealing the text of the Fourth Amendment written on his chest. Agent Smith advised Mr. Tobey he need not remove his clothes. Mr. Tobey calmly responded that he wished to express his view that TSA's enhanced screening procedures were unconstitutional.

At this point, Agent Smith radioed for assistance. As commanded by her supervisor, Appellant-Agent Jones, Agent Smith ordered Mr. Tobey to remain in front of the AIT unit. Agent Jones and unknown Appellant-Agent Doe then asked RIC police for assistance. At no point did Mr. Tobey refuse to undergo the enhanced screening procedures. Nor did he decline to do anything requested of him. In fact, Mr. Tobey alleges that he "remained quiet, composed, polite, cooperative and complied with the requests of agents and officers."

RIC police officers Vann and Mason arrived on the scene and immediately handcuffed and arrested Mr. Tobey. None of the TSA agents informed RIC police of what occurred at the screening station, nor did RIC police ask. Officer Vann escorted Mr. Tobey to a side area and informed him he was under arrest for creating a public disturbance. Agent Doe searched Mr. Tobey's belongings, removing unidentified

items. Officer Mason then collected Mr. Tobey's belongings with assistance from Agents Smith and Doe.

Mr. Tobey was then taken to the RIC police station where Officer Vann and other officers questioned Mr. Tobey and threatened him with various criminal sanctions. Mr. Tobey was eventually charged with disorderly conduct in a public place. *See* Va. Code Ann. § 18.2-415. The officers later released Mr. Tobey after consulting with an Air Marshal from the Federal Air Marshal's Joint Terrorism Task Force. In total, Mr. Tobey was held for over an hour. Mr. Tobey boarded the plane without further incident. The Common-wealth Attorney for Henrico County subsequently dropped the disorderly conduct charge.

### B.

On March 11, 2011, Mr. Tobey sued Agents Jones, Smith, and the RIC police officers under 42 U.S.C. § 1983 (state agents) and *Bivens v. Six Unknown Named Agents for the Fed. Bureau of Narcotics*, 403 U.S. 388 (1974) (federal agents), for depriving him of his (1) Fourth and Fourteenth Amendment Rights (Count One); (2) First and Fourteenth Amendment Rights (Count Two); and (3) Fourteenth Amendment Equal Protection Rights (Count Three).[1]

On June 27, 2011, Appellants Jones and Smith moved to dismiss all three claims. On August 30, 2011, the district court granted the motion with respects to Counts One and Three. In dismissing the Fourth Amendment claim, the court explained that: Tobey's "bizarre" behavior gave rise to further police inquiry; "[g]iven the heightened security interest at air-port security checkpoints . . . it was eminently reasonable for

---

[1]Mr. Tobey filed a Second Amended Complaint on October 7, 2011, alleging all three claims asserted in the initial complaint against Appellant-Agent Doe. Agent Doe moved to dismiss on November 15, 2011, and the court issued the same ruling as it had made to Agents Smith and Jones.

Smith and Jones to seek assistance from the RIC police." *Tobey v. Napolitano*, 808 F. Supp. 2d 830, 850 (E.D. Va. 2011).

The Equal Protection Clause claim was dismissed because the "complaint makes no reference to any other passengers who stripped off their clothes—much less passengers who began stripping down and continued to do so even after being told by a [TSA Agent] that it was unnecessary—or otherwise launched a protest inside the screening area." *Id.* at 849.

The district court, however, declined to dismiss Mr. Tobey's First Amendment claim. The court held that because there is a question of "whether the [TSA Agents] in fact radioed for assistance because of the message Plaintiff sought to convey or because of some other reasonable restriction on First Amendment activity in the security screening area," dismissal on the basis of qualified immunity would be improper. *Id.* at 850.

On October 31, 2011, Appellants appealed the district court decision denying their motion to dismiss the First Amendment claim. Appellants argue that Mr. Tobey did not allege a facially valid First Amendment claim and even if he did, qualified immunity bars such a claim because they did not violate a clearly established constitutional right.

## II.

Qualified immunity "shield[s] [officials] from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *see also Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). To determine whether Mr. Tobey's complaint should survive a qualified immunity-based motion to dismiss, we exercise our "sound discretion" in following the two-step inquiry laid out in *Saucier* by analyzing one, whether a constitutional vio-

lation occurred, and two, whether the right violated was clearly established. *See Pearson*, 555 U.S. at 236; *Saucier*, 533 U.S. at 200; *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). We review a qualified immunity-based motion to dismiss de novo. *Melgar*, 593 F.3d at 353.

## A.

As a threshold matter, before addressing whether Mr. Tobey asserted a plausible First Amendment violation in his complaint, we must correct an erroneous conclusion reached by the district court. Reviewing the record afresh, we find that the district court erred in concluding Mr. Tobey failed to plead Appellants in some way caused his arrest. *Tobey v. Napolitano*, 808 F. Supp. 2d at 850. The district court opined that Mr. Tobey's complaint "is devoid of any facts suggesting that [Appellants]—neither of whom are law enforcement officers with the power of arrest—made any such assertion or otherwise indicated to the RIC police that Plaintiff should be arrested." *Id.* The district court further noted that "Plaintiff's counsel conceded that the Complaint 'doesn't say directly that [Plaintiff's arrest] was at the instruction of the TSA.'" *Id.* at n.22 (citing Tr. 27:11-12). Fortunately for Mr. Tobey, he was not required to state these precise magical words in order to plausibly plead that Appellants caused his arrest. The Supreme Court reiterated in *Bell Atlantic Corp. v. Twombly* that a "formulaic recitation of the elements of a cause of action will not do." 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 268 (1986)). Allegations have facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

As the Supreme Court explained, Section 1983 (and by association *Bivens*) anticipates that a government official will be "responsible for the natural consequences of his actions." *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986) (quoting *Mon-*

*roe v. Pape*, 365 U.S. 167, 187 (1961)); *see also Berg v. County of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000) ("A government official's liability for causing an arrest is the same as for carrying it out." (internal quotation marks omitted)). It is an undoubtedly natural consequence of reporting a person to the police that the person will be arrested; especially in the scenario we have here, where TSA and RIC police act in close concert. So long as Mr. Tobey's complaint rendered it plausible that Appellants helped effectuate his arrest, the district court should have factored the arrest into its decision as to whether Mr. Tobey alleged plausible *Bivens* claims against Appellants.

When looking at Mr. Tobey's complaint and drawing all reasonable inferences in his favor, it is logical to assume that Appellants had a hand in his arrest. Mr. Tobey announced to Appellants his desire to peacefully protest TSA screening measures, and at that point, Appellants "radioed for assistance." Immediately thereafter, RIC police "seized and handcuffed" Mr. Tobey from behind without further inquiry. It is reasonable to infer that whatever Appellants told RIC police caused Mr. Tobey's arrest. This inference is bolstered by the fact that Appellants silently stood by and watched RIC police arrest Mr. Tobey. The fact that Appellants do not have the power of arrest does not hurt Mr. Tobey, but helps him, as one can infer that Appellants radioed RIC police to arrest Mr. Tobey as they could not do it themselves. It may bear out after further discovery that Appellants radioed for assistance for innocuous reasons. It may also bear out that Appellants indicated to RIC police that they should arrest Mr. Tobey. Mr. Tobey's complaint raises a plausible inference that Appellants caused his arrest, and thus it was improper for the district court to find otherwise at the 12(b)(6) phase of litigation. The district court should have considered the entire course of events up to arrest when deciding whether to dismiss Mr. Tobey's *Bivens* actions against Appellants.

With that said, for the purposes of reviewing the plausibility of Mr. Tobey's First Amendment claim, we will assume

that Appellants' liability carries through to arrest, although further discovery may prove this not to be the case. Moreover, the district court's reasoning as to why qualified immunity bars Mr. Tobey's Fourth Amendment claim or why Mr. Tobey's First Amendment claim survives a 12(b)(6) motion to dismiss has no sway on our decision, as both decisions were based in part on the erroneous conclusion that Appellants cannot be liable for Mr. Tobey's arrest. Having clarified this initial matter, we can now look at the facts and allegations in Mr. Tobey's complaint with unfettered freshness, as required by de novo review.

B.

For Mr. Tobey's First Amendment claim to survive a qualified immunity-based 12(b)(6) motion to dismiss Mr. Tobey must have plausibly alleged in his complaint that his constitutional rights were violated. A cognizable First Amendment retaliation claim requires a plaintiff to show: (1) "that [plaintiff's] speech was protected"; (2) "defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech"; and (3) "a causal relationship exists between [plaintiff's] speech and the defendant's retaliatory action." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685-86 (4th. Cir. 2000).

A complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted). A Rule 12(b)(6) motion to dismiss "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Martin*, 980 F.2d at 952. Appellants argue Mr. Tobey's complaint did not adequately set forth a First Amendment claim, and therefore must be dismissed. We disagree.

Mr. Tobey's complaint most certainly sets forth a valid First Amendment retaliation claim. In his complaint, Mr.

Tobey alleges the Appellants violated his First Amendment rights by seizing him or causing his seizure, "without probable cause because of the message conveyed by [his] silent, nonviolent expression of objection to the TSA's screening policies . . . ." He goes on to state that the Appellants "engaged in content and/or viewpoint discrimination and deprived [him] of his fundamental right to engage in free speech . . . and to engage freely in political expression as guaranteed by the First and Fourteenth Amendments to the United States Constitution."

These legal conclusions are well supported by the facts laid out in Mr. Tobey's complaint. Mr. Tobey alleges that he removed his sweatpants and t-shirt to reveal the text of the Fourth Amendment on his chest. Appellants told him that he did not have to remove his clothing, but he responded that he wished to express his views that the screening process was unconstitutional. Immediately *after* this assertion, Appellants engaged RIC police officers to arrest him.[2] They handcuffed and seized him with no questioning and without telling him why he was being arrested.

In short, Mr. Tobey's complaint satisfies all three elements of a First Amendment claim as he alleges: (1) he engaged in constitutionally protected non-violent protest; (2) he was seized as a result of the protest; and (3) the temporal proximity of his peaceful protest and his arrest, unsupported by probable cause, shows Appellants engaged in impermissible retaliation. *Cf. Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001) (observing that "the timing of the search raises an inference of retaliatory motive"). The factual allegations in the complaint, viewed as a whole, have "facial plausibility" that

_____

[2]The dissent tellingly overlooks the critical fact that Mr. Tobey alleges his arrest was *directly preceded* by his assertion to Appellants that he removed his clothing to express his message of protest and his constitutional views. By selecting facts that support its position, the dissent inaccurately assesses Mr. Tobey's constitutional claims.

"allow[ ] the court to draw reasonable inference that the defendant[s] [are] liable for misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). This is not a case where the complaint is merely "threadbare recitals of a cause of action's elements supported by mere conclusory statements." *Id.* These factual allegations, when viewed as accurate, adequately support Mr. Tobey's legal assertion that he was unlawfully seized in retaliation for exercising his protected First Amendment rights.

Appellants contend that Mr. Tobey has not pled a cognizable First Amendment claim because their actions were "reasonable" given Mr. Tobey's "bizarre" and "disruptive" conduct. This argument stems from the Supreme Court's ruling in *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992), in which the Court held that the government can impose reasonable restrictions on speech in an airport given that it is a nonpublic forum. *Id.* at 683.

Even conceding that Mr. Tobey's behavior was "bizarre," bizarre behavior alone cannot be enough to effectuate an arrest. If Appellants caused Mr. Tobey's arrest solely due to his "bizarre" behavior, Appellants' cannot be said to have acted reasonably. This is especially the case given that the First Amendment protects bizarre behavior. *See Spence v. Washington*, 418 U.S. 405, 410 (1974) (per curiam).[3] Woven

---

[3]The dissent attempts to limit the scope of Mr. Tobey's protest by referring to the removal of his clothes as "separately identifiable conduct." *Post* at 37. What the dissent fails to understand is that Mr. Tobey removed his clothes as part of his message of protest; as a result, the dissent misapprehends the application of *Spence*. *See post* at 37-38. In exact accordance with *Spence*, Mr. Tobey had a specific "intent to convey a particularized message" by removing his clothes, which would have been glaringly apparent to "[the Appellants] who viewed it." *Spence*, 418 U.S. at 410-11. At the time of the incident, there was widespread uproar over the use of AIT scans. *See* Phil Gast, *Growing Backlash against TSA Body Scanners, Pat-downs*, CNN Travel, (Nov. 13, 2010, 8:39 PM), http://www.cnn.com/2010/TRAVEL/11/12/travel.screening/index.html. Mr. Tobey removed his

into our constitutional freedoms is the belief in autonomy and the celebration of difference. For us to hold today that it is reasonable to cause an arrest due to bizarre behavior and nothing more would violate the most basic tenents of our Constitution.

Further, contrary to Appellants' assertions, bizarre does not equal disruptive. Whether Mr. Tobey was in fact "disruptive" is a disputed question of fact at this juncture. Appellants seem to think that removing clothing is *per se* disruptive. We beg to differ. Passengers routinely remove clothing at an airport screening station, and in fact are required to do so by TSA regulations. It is just as reasonable that Mr. Tobey calmly taking off his t-shirt and sweatpants caused no disruption at all, especially since he was never asked to put his clothes back on. And because we are reviewing the facts at the 12(b)(6) phase of litigation, we *must* view the facts in the light most favorable to Mr. Tobey. It could be perfectly true that after further factual development a court could find that Appellants acted reasonably given Mr. Tobey's conduct. Perhaps Mr. Tobey took off his shirt, twirled it around his head, and ripped off his pants with a dramatic flourish, indeed causing a great specta-

---

clothes in protest of TSA using AIT scanners because the machines, in essence, perform a 'virtual strip search.' With this general background, it would be hard to insist, as the dissent inexplicably does, that Appellants "miss[ed] the drift" of Mr. Tobey's "bizarre" behavior, particularly as Mr. Tobey *told Appellants that he removed his clothing to convey his message of protest*. *See Spence*, 418 U.S. at 410. Directly in line with *Spence*, therefore, "the nature of [Mr. Tobey's] activity, combined with the factual context and environment in which it was undertaken, lead to the conclusion that he engaged in a form of protected expression." 418 U.S. at 409-10. *Spence* stands for the proposition that "bizarre" behavior in the correct context can be protected expression under the First Amendment. *Id.* at 409-10. Mr. Tobey's removal of his clothing, along with his statement of protest and the Fourth Amendment on his chest, moves his allegations beyond simply "bizarre" behavior into the realm of constitutionally protected expression.

cle. However, we cannot, from this record at the 12(b)(6) stage, make this factual conclusion.

At bottom, we are not persuaded by the Appellants' reasonableness argument. The question of reasonableness is a fact-intensive inquiry, going directly to the heart of the case. In *Cornelius v. NAACP Legal Defense and Education Fund, Inc.*, the Supreme Court held that the "reasonableness of the Government's restriction [in] a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." 473 U.S. 788, 809 (1985). Based on Mr. Tobey's complaint, it is unclear whether Appellants' behavior was reasonably motivated by Mr. Tobey's "disruptive" conduct or unreasonably motivated by his protected protest. What is reasonable in this context, therefore, requires greater factual development and is better decided once discovery has been conducted. *See Martin*, 980 F.2d at 952; *DiMeglio v. Haines*, 45 F.3d 790, 795 (4th Cir. 1995) ("[W]here there is a material dispute over what the defendant did . . . it may be that the qualified immunity question cannot be resolved without discovery.").

In a similar vein, Appellants maintain that Mr. Tobey cannot plead a First Amendment violation because the alleged misconduct was consistent with a lawful TSA response. Appellants make this claim without pointing to a single regulation or law that permits seizure and arrest for the removal of an outer-layer of clothing or prohibits the display of a peaceful, non-disruptive message of protest.

The relevant TSA regulations state that "no person may interfere with . . . [TSA] screening personnel in the performance of their duties," 49 C.F.R. § 1540.109; and "[n]o person may . . . attempt to circumvent . . . any security system, measure, or procedure," 49 C.F.R. § 1540.105. Based on the facts alleged in his complaint, Mr. Tobey violated neither of these regulations. Although Appellants repeatedly mention Mr. Tobey's "disruptive" behavior as the impetus for the

arrest, Mr. Tobey specifically alleges that he did not circumvent security measures nor did he disrupt the screening process. Mr. Tobey attempted to submit to the enhanced screening procedures. He never violated an express instruction of the Appellants. In a sense, Mr. Tobey aided in Appellants' search for contraband by removing his t-shirt and sweatpants—at this point there were very few places he could have been hiding anything. Mr. Tobey was simply showing Appellants what they sought to see by using the AIT scanning machine. There is nothing before the Court at the 12(b)(6) phase that indicates Mr. Tobey removing his sweatpants and t-shirt caused any interference, disruption, or delay, in violation of any TSA regulation.

Appellants seem to think the district judge's finding of no Fourth Amendment violation controls our First Amendment analysis. As stated above, however, bizarre behavior alone is not enough to effectuate an arrest. *See supra* p. 14. Furthermore, the district court's Fourth Amendment holding is undermined by its erroneous conclusion that Appellants' cannot be found liable for Mr. Tobey's arrest. *See supra* pp. 10-12. Additionally, the idea that we are bound by the district court's rationale violates the principle of de novo review. *See Melgar*, 593 F.3d at 353. De novo review mandates that we consider the complaint and nothing more, and draw all reasonable inferences therefrom in favor of Mr. Tobey. And as a practical matter, it would be imprudent for us to base our decision on the district court's Fourth Amendment findings given that the decision is not before us and eventually can be appealed. For us to base our holding on the reasoning of an interlocutory order would be nonsensical—akin to building a house on a lot comprised of quicksand. It is illogical for us to look at the district court's Fourth Amendment findings given that Mr. Tobey still has the opportunity to appeal that decision; should the district court's dismissal of Mr. Tobey's Fourth Amendment claim be reversed, our holding today would be undermined. While we understand the First and Fourth Amendment claims are closely linked, to prejudice Mr.

Tobey on the basis of an interlocutory order that he has not yet had the opportunity to appeal is untenable. *See Baird v. Palmer*, 114 F.3d 39, 42-43 (4th Cir. 1997) ("[T]he collateral order doctrine does not confer appellate jurisdiction over an order dismissing claims against a defendant on the basis of qualified immunity, where other claims remain pending in the district court.")[4]; *see also* 28 U.S.C. § 1291.

Therefore, the district court's decision to dismiss Mr. Tobey's Fourth Amendment claim is inconsequential to this Court's finding that Mr. Tobey asserted a plausible First Amendment claim. Again, viewing the facts in the light most favorable to Mr. Tobey, we find that it is unsettled whether his behavior was in fact "disruptive" or that it was "eminently reasonable" to effectuate an arrest based on his conduct in spite of the text of the Fourth Amendment written on his chest.[5] Thus, Mr. Tobey's First Amendment claim properly survives the motion to dismiss.

Appellants also raise the argument that Mr. Tobey's complaint is deficient because it does not adequately allege that

---

[4]Mr. Tobey was *not* required to cross-appeal the district court's dismissal of his Fourth and Fourteenth Amendment claims, as our pendent jurisdiction is limited, and should only be used in extraordinary circumstances. *See, e.g.*, *Coleman v. Parker*, 349 F.3d 534, 537 (8th Cir. 2003) (holding that qualified immunity-based cross-appeal does not fall within the court's collateral order jurisdiction or within the court's pendent appellate jurisdiction).

[5]Moreover, even if we agreed with the district court's characterization of Appellants' actions as "eminently reasonable" for purposes of the Fourth Amendment, Appellants cite no authority for its argument that government action that is reasonable within the meaning of the Fourth Amendment is necessarily therefore reasonable for purposes of First Amendment analysis. If anything, the Supreme Court has suggested a more exacting inquiry under the First Amendment. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) ("Where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).

his arrest was caused by the message of protest he sought to convey. To be sure, causation is a requirement of a First Amendment retaliation claim. *See Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.3d. 1134, 1140 (4th Cir. 1990). As we said in *Huang*, "[t]he causation requirement is rigorous; it is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the [government official] would not have taken the alleged retaliatory action." *Id.* What Appellants conveniently overlook, however, is that *Huang* was before the Court on appeal from a grant of *summary judgment*. Viewing all facts as alleged by Mr. Tobey as true, which is the posture we must take when reviewing a 12(b)(6) motion, we can infer causation based on the facts, as Mr. Tobey alleges the arrest was *directly* precipitated by his constitutionally protected peaceful protest—Appellants did not take action until *after* he informed them that he wished to display his chest in order to express his views on the constitutionality of TSA screening measures. Again, it may turn out after further discovery that Mr. Tobey cannot meet this "rigorous" requirement, but without further discovery, we are unable and unwilling to speculate as to the outcome.

We are satisfied, therefore, that Mr. Tobey adequately set forth a plausible claim that his First Amendment rights were violated by Appellants.

### III.

We must next decide whether Mr. Tobey's First Amendment rights were clearly established. *See Anderson*, 483 U.S. at 638. When deciding whether a right is clearly established, we ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Henry v. Purnell*, 652 F.3d 524, 534 (4th Cir. 2011) (en banc) (quoting *Saucier*, 553 U.S. at 202).

A.

A bedrock First Amendment principle is that citizens have a right to voice dissent from government policies. *See Mills v. Alabama*, 384 U.S. 214, 218 (1966) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs."). This principle transcends forums, as the Supreme Court announced that "nondisruptive speech—such as the wearing of a T-shirt or a button that contains a political message may not be 'airport related,' but it is still protected speech even in a nonpublic forum." *Board of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987). Therefore, in a nonpublic forum such as an airport, a government official cannot "suppress expression merely because [they] oppose the speaker's view." *United States v. Kokinda*, 497 U.S. 720, 721 (1990) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)); *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677-78 (1998) (quoting *Cornelius*, 473 U.S. at 800)).

Our precedent bolsters the Supreme Court's resounding pronouncements. We have held that "[i]t is well established that a public official may not misuse his power to retaliate against an individual for the exercise of a valid constitutional right." *Trulock*, 275 F.3d at 406 (citing *Suarez*, 202 F.3d at 685). We further declared that "the First Amendment prohibits an officer from retaliating against an individual for speaking critically of the government." *Id.*

Taken together, it is crystal clear that the First Amendment protects peaceful nondisruptive speech in an airport, and that such speech cannot be suppressed solely because the government disagrees with it. Thus, Mr. Tobey's right to display a peaceful non-disruptive message in protest of a government

policy without recourse was clearly established at the time of his arrest.[6]

### B.

Appellants argue that because there is no case on-point detailing what is a reasonable restriction on speech in an airport screening area, Mr. Tobey's constitutional rights cannot be said to have been clearly established. They argue the only binding precedent, *Krishna*, states "restrictions on speech [at airport terminals] . . . need only satisfy a standard of reasonableness," 505 U.S. at 677, and that a general standard of "reasonableness" does not provide sufficient guidance as to the contours of constitutional rights. *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011) ("The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of the particular conduct is clearly established.").

While reasonableness in and of itself may be an ineffective guide as to whether a right is "clearly established," in this case there are clear constitutional parameters. It may be unclear as to what reasonableness entails in the abstract, but at a minimum, given well-established precedent, we know that it is *unreasonable* to effect an arrest without probable cause for

---

[6]The dissent correctly notes that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Post* at 29 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). In a contradictory turn of events, however, the dissent repeatedly asserts that the lack of precedent undermines Mr. Tobey's claim. *See post* at 26, 27, 28, 29, 30, 33, 36. Thus, even though the dissent purports to understand factually analogous precedent is not a prerequisite for finding that a right is clearly established, the entire dissent seemingly hinges on this very premise. Moreover, the unequivocal constitutional precedent provided Appellants with more than adequate notice that they cannot retaliate against Mr. Tobey for exercising his First Amendment rights. This is not an abstract principle but an irrefutable precept.

displaying a silent, nondisruptive message of protest—which is what allegedly occurred here. Appellants even conceded at oral argument that it would have clearly been unlawful for them to seize Mr. Tobey if the text of the Fourth Amendment was printed on his t-shirt. We see no reason why the same clear principle should not apply here, as Mr. Tobey's allegations amount to the factual equivalent.

Appellants cite *Reichle v. Howards*, 132 S. Ct. 2088 (2012) as supporting their argument that Mr. Tobey's constitutional rights were not clearly established, but in doing so, miss the mark completely. In *Reichle*, an appeal from *summary judgment*, the Supreme Court found that it was not clearly established that a plaintiff could make out a cognizable First Amendment claim for an arrest that was supported by probable cause. *Id.* at 2097. *Reichle* does not apply here because Mr. Tobey specifically alleges that his arrest was *not* supported by probable cause, and "probable cause or its absence will be at least an evidentiary issue in practically all [ ] cases." *Hartman v. Moore*, 547 U.S. 250, 265 (2006). At this stage in the litigation, of course, we must credit Mr. Tobey's allegation that Appellants arrested or caused him to be arrested without probable cause. He has, therefore, satisfied the requirement in *Hartman* and *Reichle* to plead an absence of probable cause.

Appellants also cite *Rendon v. Transportation Security Administration*, 424 F.3d. 475 (6th Cir. 2005), as controlling authority that First Amendment rights in the screening area of an airport are not clearly established. This case is irrelevant to the inquiry at hand because in that case the Sixth Circuit grappled with the question of whether TSA Regulation 49 C.F.R. § 1540.109 was constitutionally overbroad, or whether it violated the plaintiff's constitutional rights as applied. In *Rendon*, the plaintiff was being "uncooperative, unruly, and using loud profanities" and therefore was cited for violating TSA regulation 49 C.F.R. § 1540.109. 424 F.3d at 478. *Rendon* is factually distinct from what we have here. Mr. Tobey

was peaceful, cooperative, and polite—this is presumably why he was never cited for violating TSA regulations. The TSA regulations are not at issue here.[7]

Given that peaceful, silent, nondisruptive protest is protected in a nonpublic forum, like an airport; that it is unequivocally clear that the government cannot effectuate an arrest for the display of a message of peaceful protest; and that Mr. Tobey's arrest in this instance was allegedly not supported by probable cause—we find that Mr. Tobey's rights at the time of his arrest were clearly established by decades-old precedent.

## IV.

While the sensitive nature of airport security weighs heavily on the Court, protest against governmental policies goes directly to the heart of the First Amendment. The First Amendment symbolizes our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Here, Mr. Tobey engaged in a silent, peaceful protest using the text of our Constitution—he was well within the ambit of First Amendment protections. And while it is tempting to hold that First Amendment rights should acquiesce to national security in this instance, our Forefather Benjamin Franklin warned against such a temptation by opining that those "who can give up essential liberty to obtain a little temporary safety, deserve

---

[7]Even if *Rendon* was on point, we normally will not look to other circuits in order to find that the law in our Circuit is not clearly established. *See, e.g.*, *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (en banc) aff'd, 526 U.S. 603 (1999) (citing *Cullinan v. Abramson*, 128 F.3d 301, 311 (6th Cir. 1997), in which the Sixth Circuit explained that "[o]rdinarily, at least, in determining whether a right is 'clearly established' this court will not look beyond the Supreme Court and Sixth Circuit precedent").

neither liberty nor safety." We take heed of his warning and are therefore unwilling to relinquish our First Amendment protections—even in an airport.

To be clear, we are not unreasonably tying the hands of Appellants. There are certainly reasonable measures that they could have taken to ensure safety, such as asking Mr. Tobey about his intentions; fining Mr. Tobey for violating TSA regulations if there was in fact one on point; turning Mr. Tobey away from the line if he refused to put on his shirt; or most simply, asking Mr. Tobey to put his shirt back on. Instead, Appellants jumped straight to arrest, infringing upon Mr. Tobey's most basic liberty interest. The question of whether Mr. Tobey's conduct was so "bizarre" and "disruptive" that Appellants' reaction was reasonable or whether Mr. Tobey was targeted because of the words on his chest cannot be decided at the 12(b)(6) stage. It may be that discovery will reveal there is no genuine issue of material fact. Should this be the case, Appellants can move for summary judgment. *See Behrens v. Pelletier*, 516 U.S. 299 (1996) (holding that a defendant can raise the qualified-immunity defense at both the motion to dismiss and summary judgment stage). However, at this stage of the proceeding, we are satisfied that Mr. Tobey has adequately pled that Appellants violated his clearly established First Amendment rights.

## V.

Consistent with the reasoning above, we affirm the district court's denial of Appellants' qualified immunity-based motion to dismiss of Mr. Tobey's First Amendment claim.

*AFFIRMED*

WILKINSON, Circuit Judge, dissenting:

I cannot join the majority's decision permitting a damages action to proceed against Transportation Security Administration ("TSA") agents who were faithfully performing one of the most essential functions in our post-9/11 age: protecting air passengers from the threat of air terrorism. We now view these events in the comfort of hindsight. But while some may consider plaintiff Aaron Tobey's conduct to be cute or even funny in retrospect, it was no laughing matter at the time.

According to the facts alleged in his complaint, Tobey engaged in what his own counsel and the district court both described as "bizarre" behavior in the security-screening area of Richmond International Airport, removing his shirt and pants despite being told that he did not need to disrobe. *Tobey v. Napolitano*, 808 F. Supp. 2d 830, 850 (E.D. Va. 2011). His "complaint makes no reference to any other passengers who stripped off their clothes—much less passengers who began stripping down and continued to do so even after being told by a [TSA agent] that it was unnecessary—or otherwise launched a protest inside the screening area." *Id.* at 849.

Airport screening procedures should, of course, be open to debate and criticism. Had this protest been launched somewhere other than in the security-screening area, we would have a much different case. But Tobey's antics diverted defendants from their passenger-screening duties for a period, a diversion that nefarious actors could have exploited to dangerous effect. Defendants responded as any passenger would hope they would, summoning local law enforcement to remove Tobey—and the distraction he was creating—from the scene.

For their reasonable efforts to allow the regular screening process to resume and to ensure passenger safety, defendants have been rewarded with the protracted burdens of a lawsuit and the prospect of significant damages liability. Given the

way they have been treated, I would expect other TSA agents to refrain from responding to some unknown quantum of future security threats. And who could blame them?

The majority's decision is not only unwise, but also profoundly unfair. Imagine having to make repeated prompt decisions—all while the lives of others just might hang in the balance. Now imagine being hauled into court and threatened with damages liability for those decisions, having never received sufficient notice as to the legal standards by which your conduct would be judged. Such is the deprivation of due process that the majority countenances today.

There is, of course, a familiar legal doctrine designed to avert the exactions of lawsuits like Tobey's. For nearly forty years, the Supreme Court has consistently held that government officials performing discretionary functions enjoy qualified immunity from damages actions so long as they do not violate "clearly established" law. *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223 (2009); *Saucier v. Katz*, 533 U.S. 194 (2001); *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Scheuer v. Rhodes*, 416 U.S. 232 (1974). The Court has, moreover, repeatedly averred that qualified immunity is an immunity not just from liability, but from suit, and that questions related to such immunity should accordingly be resolved earlier rather than later in the game. How sad that a message crafted so plainly at the headwaters of a hierarchical judicial system has failed to find its way downstream.

One would think the Supreme Court's admonitions on the need for some modicum of specificity in notice to defendants might actually mean something. *See, e.g.*, *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083-84 (2011); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). And yet, by allowing Tobey's suit to proceed by enunciating legal principles at the highest and most nebulous level of generality, the majority deprives the doctrine of its value. One would think that the uniquely sensitive nature of a security-screening area might have figured in

the majority's analysis. Yet it cites not one—not even one—case that would have afforded these agents anything resembling fair notice of what might be expected of them in the sensitive location and situation in which they found themselves. The majority says long after the fact what it believes these agents might have done, *see ante* at 24, but again it fails to reference even a single case from the Supreme Court, this court, or any other to support its view. If qualified immunity was not created to keep suits like this one from gathering steam, then I fail to see what utility the defense will have. I regret that a doctrine so essential to the performance of public functions has been reduced to hollow and formulaic recitations that signal only its demise.

## I.

The most unsettling aspect of this decision is that of scapegoating low-level officials without ever apprising them of the legal standards governing their conduct. In denying the immunity, we are blindsiding others in a way we would never countenance for ourselves. Judges, after all, should appreciate the difficulty of judgment.

By affording officials the latitude to make reasonable judgments, qualified immunity helps to avert two evils. Subjecting officials to damages actions when the governing law is unclear would incur "substantial social costs," as "fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson*, 483 U.S. at 638. But qualified immunity is not premised on a utilitarian calculus alone; it also seeks to prevent "the injustice . . . of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion." *Scheuer*, 416 U.S. at 240.

I do understand that, like the proverbial Roman tax collector, TSA screening agents are not natural objects of affection. It may seem a strange expenditure of energy strongly to

defend them. Yet the most unpopular persons may not be treated unfairly under law, and that is especially the case when law itself has tasked them with the unpopular function that nonetheless is necessary to the achievement of a larger social good. The good of safe air travel seems too obvious to mention. The very last way to achieve that good is to penalize without a crumb of notice those who make it possible.

A straightforward application of the elementary principles of qualified immunity leads inexorably to the conclusion that this complaint must be dismissed. For the legal standard identified by Tobey and the majority as governing this case could not possibly have provided adequate notice to defendants that their alleged actions were unlawful. According to that standard, because an airport is a nonpublic forum, any regulation restricting speech therein "need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992). This standard encompasses two prongs—a reasonableness requirement and a ban on viewpoint discrimination —and though the majority repeatedly conflates them in its analysis, they impose distinct requirements. Considering each in turn, it becomes evident that no case law could possibly have put defendants on notice that they could not respond to Tobey's conduct by defusing the situation as they did.

A.

Start with the requirement that restrictions on speech in a nonpublic forum be "reasonable." The majority concedes that a general reasonableness requirement does not in itself create clearly established law sufficient to defeat a qualified-immunity defense. *Ante* at 21 (citing *al-Kidd*, 131 S. Ct. at 2084 ("The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.")). This makes sense,

of course, for how could an official possibly divine from a general command to "be reasonable" specific standards of conduct suited to the varied—and often unpredictable—circumstances he or she might face?

Because a general reasonableness requirement is so vague, Tobey and the majority must identify some case law that would have given defendants fair notice that it would be unreasonable to respond to his specific conduct by summoning local law enforcement. Yet they fail to do so, ignoring the Supreme Court's admonition that courts must not "define clearly established law at a high level of generality," *al-Kidd*, 131 S. Ct. at 2084, but rather must identify a constitutional right that was "'clearly established' in a more particularized, and hence more relevant, sense," *Anderson*, 483 U.S. at 640. To be sure, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). But in the absence of some precedent addressing the scenario at issue, officials will have sufficient notice only when "'a general constitutional rule already identified in the decisional law . . . appl-[ies] *with obvious clarity* to the *specific conduct* in question.'" *Id.* at 741 (emphases added) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). What the majority fails to appreciate is that qualified immunity requires "that in the light of pre-existing law the unlawfulness must be *apparent*." *Anderson*, 483 U.S. at 640 (emphasis added).

General propositions stripped of all sense of context may seem useful to my fine appellate colleagues, *see ante* at 21 n.6, but they are of no use at all to people who must confront specific and difficult real-life situations. Neither Tobey nor the majority points to a single court decision addressing a situation even remotely similar in time, place, or manner to the one that occurred here, let alone a decision that would have made the unlawfulness of defendants' actions "apparent." They cite no decision involving the period before scores of passengers board airplanes, no decision involving the

security-screening area of an airport, and no decision involving distracting conduct that poses a potential security threat. Indeed, in the only appellate decision that even somewhat resembles this case, the court ruled *for* the government defendants, a ruling that would hardly have counseled defendants to have acted in a different fashion than they did. *See Rendon v. TSA*, 424 F.3d 475 (6th Cir. 2005). The complete dearth of pertinent precedent should be dispositive of the question whether it was clearly established that defendants' conduct was unreasonable: it was not.

Especially telling is the failure by Tobey and the majority to cite a single case involving conduct that disrupts security-screening activities, as Tobey's conduct evidently did. The majority finds it significant that Tobey's complaint nowhere explicitly alleges that his behavior caused any disruption but, on the contrary, asserts that he "remained quiet, composed, polite, cooperative, and complied with the requests of agents and officers." *Ante* at 7. This statement, however, does not render defendants' alleged actions unreasonable. First, it is belied by other allegations in the complaint. For example, as the district court noted, Tobey "alleges that he began stripping off his clothes inside the security screening area and continued to do so even after [one defendant] advised that removal of clothing was unnecessary." *Tobey*, 808 F. Supp. 2d at 850. Second, while it may be true that "[p]assengers routinely remove clothing at an airport screening station," *ante* at 15, they do not routinely doff their undershirts and bare their chests; Tobey deliberately and indisputably removed much more clothing than is consistent with ordinary TSA screening practices. Needless to say, Tobey and the majority point to no decision holding that it is unreasonable to detain someone who fails to follow TSA instructions and proceeds in a manner calculated to divert attention from the normal screening process and redirect it toward himself.

In addition, whether or not Tobey caused a visible commotion in the screening area—whether or not he "took off his

shirt, twirled it around his head, and ripped off his pants with a dramatic flourish, indeed causing a great spectacle," *ante* at 15-16—it is a simple matter of common sense that his behavior was disruptive. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). This inference follows ineluctably from the face of the complaint. Outside a few limited contexts, such as public swimming pools, removing one's shirt and pants will always attract other people's attention and distract them from whatever they happen to be doing. Tobey's own counsel conceded as much when he described his client's behavior as "bizarre," an impression that the district court evidently shared. *See Tobey*, 808 F. Supp. 2d at 850 ("Plaintiff's counsel conceded at oral argument that Plaintiff's behavior was bizarre, and that [defendants] were justified in summoning the [local p]olice for further inquiry."). And Tobey himself anticipated the disruption his behavior might cause, alleging in his complaint that he purposefully "waited for the number of people in line to diminish" in order to "avoid the possibility of causing delay for his fellow passengers."

Of course, the majority offers no guidance whatsoever to TSA officials as to how many people must be waiting in line before they may take even modest preventive steps. And for good reason. Conduct like Tobey's inevitably delays the screening process for other passengers, and referring a person who engages in it to local authorities prevents the screening line from jamming up and allows for a careful assessment of any threat the person might pose. *See Rendon*, 424 F.3d at 479. Such a referral was a perfectly reasonable step to take, as it provided an opportunity for further evaluation of the situation while avoiding any further potential disruptions to the screening process.

Disruptions in an airport security-screening area, especially ones involving "bizarre" behavior like public stripping, pose

safety risks. As TSA regulations recognize, "[c]heckpoint disruptions potentially can be dangerous" for a number of reasons, including: a "disruptive individual may be attempting to discourage the screener from being as thorough as required"; a "screener may . . . need to summon a checkpoint screening supervisor and law enforcement officer, taking them away from other duties"; and "[a] screener encountering such a situation must turn away from his or her normal duties to deal with the disruptive individual, which may affect the screening of other individuals." 67 Fed. Reg. 8340, 8344 (Feb. 22, 2002). TSA regulations accordingly provide that "[n]o person may interfere with . . . screening personnel in the performance of their screening duties." 49 C.F.R. § 1540.109 (2012). Passenger safety would seem to require that TSA agents be able to focus on their screening tasks, unimpeded by boarding passengers attempting to divert their attention, whether as a means of protest or for more sinister purposes.

To deem defendants' response to Tobey's distracting behavior not only unreasonable, but clearly so, is to posit a world in which TSA agents can afford to indulge individuals' flamboyant propensities in one of the most sensitive areas of the airport. After recent plots involving commercial aircraft, it should go without saying that this is not the world in which we live.

Tobey may very well have had benign motives. He may very well have posed no immediate security threat himself. But it will hardly do to countenance lengthy discovery in an attempt to discern what TSA agents could not possibly have known at the time. They had minutes to figure out what will take us months. They were not allowed simply to assume nonchalantly that Tobey's actions were a harmless prank. They could not possibly have known how far he would go in disrobing or what further actions he was prepared to take. They could not close their eyes to the obvious risks that his distracting behavior created for his fellow passengers' safety. Although no serious harm was done this time, "the Govern-

ment need not wait until havoc is wreaked to restrict access to a nonpublic forum." *Cornelius v. NAACP*, 473 U.S. 788, 810 (1985). In the absence of a single precedent instructing government officials to permit publicity stunts in highly sensitive venues like airport security-screening areas, I fail to see how defendants' response was unreasonable, let alone how any unreasonableness was "clearly established."

B.

As for the prohibition against viewpoint discrimination in a nonpublic forum, Tobey's complaint alleges no violation of this prohibition at all—let alone one that was "clearly established." To be sure, he advances a conclusory legal allegation to that effect. Not once in his complaint, however, does Tobey plead a fact that would even suggest that defendants reacted to the viewpoint he expressed rather than to his state of undress.

Tobey does not suggest that defendants spoke even one word of disagreement with his message before summoning local police. He does not plead that they tolerated nonexpressive disruption in the screening area. And most tellingly of all, as the district court noted, his "complaint makes no reference to any other passengers who stripped off their clothes—much less passengers who began stripping down and continued to do so even after being told by a [TSA agent] that it was unnecessary—or otherwise launched a protest inside the screening area" but who were not removed. *Tobey*, 808 F. Supp. 2d at 849.

Had defendants truly committed viewpoint discrimination, one would think that Tobey could point to at least one comment or one comparator, someone who engaged in similarly distracting conduct but who expressed a viewpoint different from his (or no viewpoint at all) and whom defendants permitted to remain in the screening area. He does point to pictorial displays of people in bathing suits and athletic shorts that

were posted in other areas of the airport, but his attempt to analogize his personal behavior to pictorial displays elsewhere is singularly unpersuasive. Tobey obviously experienced the events giving rise to this suit firsthand. He had every incentive to include every detail that could possibly help his case in his complaint. That he failed to plead a single telltale sign of viewpoint bias betrays just how baseless his claim really is.

What Tobey's complaint does plead is not viewpoint discrimination, but a perfectly reasonable response by defendants to his highly unusual and potentially dangerous stunt. How can it possibly be viewpoint bias to refer someone in a state of unauthorized public undress for further evaluation and allow the routine screening process at an airport to resume? The agents here went the extra mile. Before ever summoning local law enforcement, one defendant "informed [Tobey] that removal of clothing was not necessary." It is an irony to say the least that the defendants whose "intrusive" conduct Tobey was protesting were simultaneously advising him that intrusive screening measures were "not necessary." In case there were any doubt, this statement confirms that defendants were concerned not with Tobey's viewpoint, but with the fact that he was standing nearly naked in the worst possible place. It is sheer fancy to think that defendants had anything on their minds other than eliminating the distraction that Tobey's state of dishabille was causing.

But even if defendants engaged in viewpoint discrimination, as Tobey improbably alleges, it was not clearly established that such discrimination was unconstitutional in the very limited setting of this case. The majority notes that it is clearly established that "citizens have a right to voice dissent from government policies," *ante* at 20 (citing *Mills v. Alabama*, 384 U.S. 214, 218 (1966)); that even in a nonpublic forum, "government official[s] cannot 'suppress expression merely because [they] oppose the speaker's view,'" *ante* at 20 (quoting *United States v. Kokinda*, 497 U.S. 720, 721 (1990));

and that "'a public official may not misuse his power to retaliate against an individual for the exercise of a valid constitutional right,'" *ante* at 20 (quoting *Trulock v. Freeh*, 275 F.3d 391, 406 (4th Cir. 2001)). While these abstract propositions are as incontestable judicially as mom and apple pie, they fail to provide the kind of concrete guidance that could have rendered defendants' alleged constitutional violation "clearly established."

Of course the First Amendment subjects viewpoint discrimination to strict scrutiny—as well it should. But the government has a "compelling interest" in ensuring the safety of its citizens. That interest is not abrogated when they take to the air. A "narrowly tailored" means of achieving that interest, moreover, will on rare occasions involve taking into account the views expressed by individuals. As Justice Ginsburg recently explained, because law-enforcement officers performing a "protective function" will "rightly take into account words spoken to, or in the proximity of, the person whose safety is their charge," "retaliatory animus cannot be inferred from the assessment they ma[k]e" of those words so long as the assessment is "rational." *Reichle v. Howards*, 132 S. Ct. 2088, 2097-98 (2012) (Ginsburg, J., concurring in the judgment). Consider someone who shouts in the security-screening area, "All citizens have a constitutional right to carry guns on airplanes." No one denies that TSA agents could weigh the speaker's viewpoint without violating the First Amendment; indeed, we would regard any TSA agent who failed to do so as dangerously incompetent. And when agents confront a passenger like Tobey, who so dramatically expressed opposition to security-screening precautions right before boarding a flight, they confront a situation that only a naif would ignore. The passenger may turn out to be harmless, but the Constitution cannot possibly be construed to require TSA agents to take that gamble.

In addition, Tobey must prove that defendants' alleged viewpoint discrimination *caused* his seizure. *See Suarez Corp.*

*Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000).
Tobey's complaint, however, alleged a violation of the Fourth
Amendment as well as the First, and for many of the reasons
noted above, the district court rightly dismissed Tobey's
Fourth Amendment claim, describing defendants' decision to
summon local law enforcement as "eminently reasonable."
*Tobey*, 808 F. Supp. 2d at 850. This conclusion should have
led it to dispose of Tobey's First Amendment claim as well.
For just last Term, the Supreme Court held that, notwithstand-
ing the First Amendment's general prohibition against retalia-
tory arrests, "the more specific right to be free from a
retaliatory arrest that is otherwise supported by probable
cause" is not clearly established for purposes of qualified
immunity, reasoning that any inference of impermissible cau-
sation is severely undermined by the existence of probable
cause. *Reichle*, 132 S. Ct. at 2094 (majority opinion).

The same conclusion applies here: the causation element of
Tobey's First Amendment claim is undermined, if not viti-
ated, by the fact that defendants' actions were reasonable
under the Fourth Amendment. In light of *Reichle*, then, it was
not clearly established that these same actions violated the
First Amendment.

The majority responds by pointing to Tobey's allegation
that defendants' actions were not supported by "probable
cause." *See ante* at 21. The problem with this argument is that
neither Tobey nor the majority cites a single case holding that
probable cause is the relevant standard governing the decision
by an official who does not have arresting authority, such as
a TSA agent, to refer someone to another official who does.
And any confusion regarding the appropriate Fourth Amend-
ment standard only bolsters the conclusion that defendants'
alleged constitutional violation was not clearly established.
For the majority to hold otherwise, it must ignore conflicting
precedents and expect lay TSA agents to have imposed on the
spot a degree of coherence on First and Fourth Amendment
jurisprudence that has eluded serious students of constitu-

tional law. Qualified immunity exists to forestall precisely this result.

## C.

Unable to muster a single case so much as suggesting that defendants' conduct was either (1) unreasonable or (2) impermissibly based on viewpoint, the majority instead attempts to find clearly established law in abstract principles snatched from disparate areas of First Amendment doctrine. First, the majority appears to embrace Tobey's pronouncement that "individuals possess First Amendment rights at airports." *See ante* at 20 (citing *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 576 (1987)). Of course they do. But that lofty proposition is not at issue in this case. The question, rather, is how these rights apply in the special context of security screening. By woodenly invoking any First Amendment precedent that happens to involve an airport, Tobey and the majority ignore the fact that this case concerns not the airport in general, but the security-screening area in particular, as well as the pressing security concerns that are uniquely relevant there. The Supreme Court's airport cases simply do not speak to this special context and thus could not have given defendants notice that their response to Tobey's conduct may have been unconstitutional.

Second, the majority cites *Spence v. Washington*, 418 U.S. 405, 410 (1974) (per curiam), for the proposition that "the First Amendment protects bizarre behavior." *Ante* at 14. That is not what *Spence* said. Rather, *Spence* held that what might otherwise seem like "bizarre behavior" may in fact be protected symbolic speech where "[a]n intent to convey a particularized message was present, and [where] in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence*, 418 U.S. at 410-11. Even when these conditions are met, however, the government may, consistent with the First Amendment, reasonably respond to any "separately identifiable conduct" in

which the speaker engages. *Cohen v. California*, 403 U.S. 15, 18 (1971). That was the case here. Tobey did not simply wear a t-shirt bearing his message, but rather engaged in the "separately identifiable conduct" of removing his shirt and pants. As noted earlier, Tobey's own complaint makes clear that it was this conduct that provoked defendants' response. Moreover, *Spence* had absolutely nothing to do with airport security screening. It concerned the display, from an apartment window, of an American flag with an appended peace symbol, and to claim it provided specific guidance in the wholly different context here is an acrobatic leap that my friends in the majority should have the prudence to resist.

### D.

The majority attempts to mitigate the injustice of its qualified-immunity ruling by noting that defendants still might receive such immunity at the summary-judgment stage. *See ante* at 24. Small consolation that. The multiple admonitions that fall on deaf ears today hardly assure a receptive audience tomorrow. Among those admonitions are the Supreme Court's repeated instructions that qualified immunity is an immunity from suit, not just damages, and that it must therefore be recognized before the considerable costs of litigation accumulate. *See, e.g.*, *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam); *Siegert v. Gilley*, 500 U.S. 226, 233 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985). Whatever the eventual outcome of this suit might be, defendants are left to suffer the immediate consequences, the very consequences that any immunity, to be effective, is designed to alleviate.

### II.

Tobey's suit fails for another, independent reason, and in rejecting this reason, the majority manages to flout a second body of Supreme Court precedent. In a recent line of decisions, the Court has held that a plaintiff must allege enough

factual content in his complaint to render his legal claim for relief "plausible on its face" in order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Tobey's complaint falls well short of this requirement, for it conclusorily asserts that defendants engaged in viewpoint discrimination without pleading so much as a single factual allegation that supports this conclusion. In short, by announcing a near-categorical rule that every complaint survives a motion to dismiss, the majority proceeds as if *Twombly* and *Iqbal* were purely advisory.

The rules of pleading assume particular importance in the context of a damages action against a public official, especially one alleging that the official acted with an impermissible motive. As the Supreme Court explained even before *Iqbal*, "[b]ecause an official's state of mind is easy to allege and hard to disprove," a court confronting such an allegation "must exercise its discretion in a way that protects the substance of the qualified immunity defense . . . so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings." *Crawford-El v. Britton*, 523 U.S. 574, 584-85, 597-98 (1998) (internal quotation marks omitted). This Court has similarly observed that "the protection afforded officials by an objective test [for qualified immunity] would be illusory if the simple allegation of discriminatory animus sufficed to set it aside." *Gooden v. Howard Cnty., Md.*, 954 F.2d 960, 969 (4th Cir. 1992) (en banc). The doctrine of qualified immunity and the rules of pleading are therefore mutually reinforcing: the former ensures that officials cannot be subjected to damages suits for making close judgment calls where the governing law was unclear, while the latter ensure that this defense cannot be defeated by a bare allegation of impermissible motive.

In light of these principles, it becomes clear that Tobey's complaint fails to allege a "plausible" claim of viewpoint discrimination against defendants. This inquiry is governed by

what should by now be a familiar two-step analysis. First, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth" ordinarily accorded the allegations in a complaint at the motion-to-dismiss stage. *Iqbal*, 556 U.S. at 679. Mere "'labels and conclusions'" or "'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). Nor will "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Second, setting aside any unsupported legal conclusions, a court "should assume the[ ] veracity" of any remaining "well-pleaded factual allegations" and "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557). Thus, a plaintiff fails to adequately plead his claim that a defendant acted unlawfully if there exists an "'obvious alternative explanation'" for the defendant's conduct that renders the unlawful explanation implausible. *Id.* at 682 (quoting *Twombly*, 550 U.S. at 567).

The only reference to viewpoint discrimination in Tobey's entire complaint constitutes a "naked assertion," not a "well-pleaded factual allegation." Tobey asserts that defendants "seized [him], or in collaboration with others caused his seizure, without probable cause because of the message conveyed by Plaintiff's silent, nonviolent expression of objection to the TSA's screening policies . . . and thereby engaged in content and/or viewpoint discrimination." This allegation amounts to nothing more than a "formulaic recitation of the elements" of a First Amendment retaliation claim. To make out such a claim, a plaintiff must show (1) "that his or her speech was protected," (2) "that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech," and (3) "that a causal relationship exists between [the plaintiff's] speech and the defendant's retalia-

tory action." *McGraw*, 202 F.3d at 686. Tobey asserts that defendants acted "because of" his speech and thus engaged in "viewpoint discrimination," but these phrases do no more than reiterate the third element of a retaliation claim; they in no way make it more plausible that the element is satisfied in this case.

Indeed, Tobey's allegation of viewpoint discrimination is barely distinguishable from the allegation of religious and racial discrimination that the Supreme Court rejected as conclusory in *Iqbal*. According to Iqbal's allegation, the defendants in that case "'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest.'" *Iqbal*, 556 U.S. at 680. Substitute "message" for "religion, race, and/or national origin" and "because of" for "solely on account of" and you basically have Tobey's allegation of viewpoint discrimination. If Iqbal's allegation could not pass as a well-pleaded fact, then Tobey's cannot fare any better.

Stripped of the conclusory allegation of viewpoint discrimination, Tobey's First Amendment claim "stops well short of the line between possible and plausible." Only two factual allegations in Tobey's 128-paragraph complaint concern the actions of defendants at issue here. Specifically, Tobey alleges, first, that, after he removed his shirt and pants, one defendant "informed [him] that removal of clothing was not necessary," and, second, that the same defendant "radioed for assistance" when Tobey remained unclothed and stated his opposition to TSA screening procedures, while another "direct[ed] [him] to stay where he was" pending the arrival of local law enforcement. These allegations do not render Tobey's claim of viewpoint discrimination remotely plausible. On the contrary, there is an "obvious alternative explanation" for defendants' alleged actions—namely, that they summoned local law enforcement because of Tobey's nearly

naked state. *Iqbal*, 556 U.S. at 682. Although it suggests otherwise, *see ante* at 13 n.2, it is the majority that fails to recognize that the TSA agents took action only *after* Tobey gratuitously stripped his clothing and emerged in the security-screening area in a state of undress. Tobey's own complaint thus not only fails to negate the obvious alternative explanation for defendants' conduct; it positively reinforces it. His allegation that one defendant "informed [him] that removal of clothing was not necessary" evinces a focus on his undress rather than his speech. Moreover, the complaint describes a course of conduct on the part of defendants that was not only perfectly reasonable in its own right, but also perfectly consistent with the First Amendment. It is unusual to have a complaint whose allegations work so actively to make defendants' case, but so it is with Tobey's.

The majority's approach to this case misses the entire point of *Twombly* and *Iqbal*. American jurisprudence has long been founded on the presumption of innocence. That makes especial sense in the context of criminal justice, when the state bears the burden not only of proving guilt, but of doing so beyond a reasonable doubt. *Twombly* and *Iqbal* make clear, however, that the presumption of innocence retains some meaning even in the different context of a civil action. That is to say, a legal system is not justified in presuming culpability based on the mere "possibility" of the same if there exists a perfectly "obvious" and innocent explanation for a defendant's actions. Here, the explanation of innocence is not only obvious but likely, given the potential security threat posed by Tobey's conduct. To reject *Twombly* and *Iqbal* in circumstances such as these is to accord no significance at all to the signal contribution of those cases, which presumes that Americans, even those in government, act within the strictures of the law and allocates the burden of plausibly showing otherwise to those who charge unlawful conduct.

### III.

Whatever the ultimate fate of Tobey's lawsuit,* it is hard to overlook the injustice done these defendants, who have been deprived of the most straightforward application of qualified-immunity doctrines and *Twombly/Iqbal* pleading standards. Faithfully applying these doctrines would not lead us to constrict the First Amendment values that Tobey and the majority claim to champion. Consider all the other venues in which Tobey could have protested TSA screening policies. Indeed, many airports have permitted such protests in less sensitive locations. *See, e.g.*, Lee Bergquist, *Airport Body Scan Protests Fizzle Out*, Milwaukee J. Sentinel, Nov. 24, 2010, http://www.jsonline.com/news/milwaukee/110365459 .html. Had Tobey mounted his protest somewhere other than the security-screening area, we would have confronted a very different question. I am sure the particular strategy employed by Tobey helped to attract greater attention to his message. But it is always true that the more disruptive the speaker, the more attention the message garners. And if that becomes the abiding principle of decision, then the law of reasonable time, place, and manner restrictions will be soon set at naught. Just as one may not shout "Fire!" falsely in a crowded theater, so one may not theatrically divert TSA agents in their screening tasks, even in order to express disapproval of their actions.

No one enjoys having to endure the inconvenience of airport security screening. No one wants to toss his or her shoes and other personal effects into a bin. TSA agents, moreover, can and do make mistakes, and there is always the chance that imbuing subordinate officials with a bit of authority can make them tyrants in their spheres. Whether TSA screening procedures are too intrusive and demeaning is surely a debate worth having, and Tobey may well have something of value to con-

---

*Whether the cause of action asserted by Tobey would lie under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), is not before us, and I do not address it.

tribute to it. But TSA agents also perform what is indubitably a vital function, and it is sometimes necessary to make small sacrifices to achieve greater gains or, as in this case, to avoid catastrophic loss.

Wherever the grand balance may be struck, the particulars here leave little room for doubt. These agents were not out to squelch speech or to handle passengers rudely. They advised less intrusive measures, not more. The provocation was then thrust upon them, and they gave to passenger protection the benefit of the doubt. They have now been entangled in a lawsuit without so much as a pass at proper notice. They face further litigation for doing nothing more than seeking to ensure our safety in the skies.

They deserve better. I respectfully dissent.